Hello again. Once again, Jamison Etzel for the appellant and Cross Appellee. This time I'd like to reserve five minutes, please. Okay, please watch the clock. So in this one, the district court dismissed this by saying that we hadn't sufficiently alleged that the full story software intercepted the contents of Mikulsky's communications with the Bloomingdale's website. That was error because our complaint alleges that Mikulsky went through a full transaction, made purchases on the Bloomingdale's website, and also we allege that while on the website, everything she does is captured by the session replay code. So I would submit that it's not possible to buy a product from an online merchant without communicating a substantive message to that merchant. We listed some specific items of information, her name, address, credit card information, all the things you would need to make a payment, including her product selection. We didn't identify the specific product, but we said she bought a product. And the district court just said all of this is record data. And the district court referenced the Inri Zenga case. But if you go and look at the facts of that case, there's a very much more limited set of information that was at issue in that case. It was just, I think, Facebook ID refer information. So there were no user-generated communications whatsoever at issue in that case. And we don't dispute the holding of Inri Zenga. We think it draws a fair line between contents on the one hand and record information or pen register-like information on the one hand, which is metadata about a communication. It's not the communication. But again, our case, we said everything, all text, all mouse movements, all clicks, product choices. I mean, it's throughout the record. And that all of that is captured. So you put two and two together. She went through. She bought something. She gave her credit card information. And meanwhile, everything she does is intercepted by Full Story. Two plus two equals four, the contents of the communications were intercepted here. Full Story violated 630. Well, Bloomingdale's violated 631 by employing Full Story to learn and obtain the contents of her communications. Now, this time, the specific allegations under the fourth prong, the aiding and abetting, at ER 4243, I mean, we do use the specific word that Bloomingdale's employed, or I only wrote it partway down, that basically aids. We use the word aids. We use the word employed at ER 15, paragraphs four and five. So on that issue, I think we've pretty clearly stated the claim. And on the contents issue, I just, I don't see any conclusion to draw except that the district court overly read what record data means and took Inri Zenga and blew it up to cover basically everything. And in their response briefs on this issue, Bloomingdale's has done a couple things. One, they've tried to point out that Full Story's materials say there's a way to mask some fields, some text and everything, including the credit card information, was captured by Full Story. They responded with the pamphlet that Full Story puts out that says, you know, we ask our clients to, or we insist that our clients mask any sensitive information so we don't get it. But all this is beside the point because even if you took the credit card data out of the equation, there's still contents of communications here, which is her product selection, her name and address. That's, those are messages that she put into the website, transmitted to Bloomingdale's so that she could make her purchase. And the session replay code captured all of that. When she put something in her cart, the mouse click, move it in, that's captured. She's communicating the message, I would like to buy this product or I'm at least interested in this product. Then as she moves a little later, she'll start clicking like, I do want to buy this product. Here's how I'm going to pay for it. I'm going to do credit card. Where do I want to get it? She could choose either at home delivery or she could go pick it up at a California Bloomingdale's store. So throughout that process, she's obviously communicating messages of substance. I guess today I haven't addressed yet the personal jurisdiction issue at all, but I could do that. I believe, as I've said in our supplemental briefs, that after Briskin, there really aren't any arguments left for them. Not only have they done everything that Shopify was doing in Briskin. I mean, it's slightly different technology, but it's analogous in terms of the jurisdictional facts. But Bloomingdale's here has a physical presence in California. They're selling products in California, both in person and online. And the claim arises out of or relates to that conduct because our client was making a purchase when she was wiretapped. And she was wiretapped in California because they sent the code onto her browser, which was in California. And we have clear allegations on all of those things. So I think personal jurisdiction recovered. The other argument they've made is that she consented to this at the very end of the transaction. I would agree with the Javier opinion. It just doesn't make sense to say that someone can consent to a wiretap at the end of the communication. Because what if she said no? What if she's all the way checking out and she wants to buy the product, and then they're like, oh, hey, by the way, Full Story's been seeing everything that you've been doing. Do you agree? She could not agree, but it doesn't matter. They already did it. As we allege, this is instantaneous interception. So the cases that interpret California law as requiring prior consent for this type of eavesdropping, this type of third-party listening, they're exactly correct. Because it's just not fair to tell someone. Consent is not defined, I don't think, in the statute. So is there even an open question for us to think about there? Or has California shut the door and just said prior consent, period? I would take that position. That's my understanding of most of the cases that have gone there. There's not a ton out there. And I think there's one... I could see that California could do the opposite. I mean, you made the argument that, well, how could it be that you could consent after the fact? Well, we do that in the law all the time. It's called ratification, right? Something that you didn't know or you didn't like or whatever, and then after the fact, you say, fine. So that could be. California could say consent encompasses that. It could be consent at any point. But if California's cases have said it must be before, then I don't know that there's a question here for us to wrestle with. Yeah, I think the problem is there's no... If somebody is presented with the choice at the end and they say no, there's no way for them to get that communication back from Full Story. They're not presented with that choice. Oh, do you want to delete all of the stuff that Full Story's been collecting while you've been on the website? They're not presented with that choice. So there's just no meaningful consent here at all. And furthermore, even if you do open up their policy, they're not actually describing what's going on here. They say some things like we may collect, we may share, we may use cookies. They're not saying there's a third party that even if you don't finish typing something in and submitting it to us, they're getting it as it happens. I think this type of technology is so much more of a live wire connection to a third party that you really need to be clear. If you're going to use this technology, and we admit it has legitimate uses, but if a company's going to use something like this, they need to provide very clear upfront notice that while you're here, someone else is listening. And that's what people... That's what most reputable companies do in telephone communications. They say it at the beginning. This call may be recorded or monitored. Everyone's heard that a million times and they hear it right at the beginning. Because if somebody doesn't want to be recorded, that's their chance to say, I don't like this. I want to hang up. I'd rather not be recorded. Or ask, is there a way for you to not record? Give them the opportunity at the beginning. The California legislature, they drew a line here. They said, no one may listen without the consent of all parties. And I think at some point, not everyone needs to know everything about everyone. I know enough. I'm not comfortable with that. I don't want all of my data collected everywhere all the time. At least give them a choice. And that's really what most of these cases, the issue we're presenting is, give people fair notice and give them a choice. Because the contents issue was really the main basis of the court's dismissal. If the court doesn't have any further questions, I mean, I'm happy to just sit down and reserve the rest of the time. I think I've got that. Good morning, Your Honors. May it please the Court. I'm going to start with personal jurisdiction, obviously taking into account our prior conversation. And in the last argument on Papa John's, we're focused on and asking questions about, you know, why would anyone visit Papa John's website other than to buy a pizza? And with respect to Bloomingdale's, I think the answer is clear and obvious why a lot of people would visit the Bloomingdale's website other than to purchase a product from a brick-and-mortar store that may not be near them. They want to see the latest fashions, the latest styles. They're comparing clothing across different locations. People browse clothing websites just like they browse clothing stores. And so while, you know, I'm not going to re-argue the last case. We didn't think that was dispositive. But here, that concern would not be present that there's no reason to go to the Bloomingdale's website other than you want to interact with a brick-and-mortar store that may not be anywhere near you. In many states, there are none to one store, yet they're website visitors. If there are not questions on personal jurisdiction, I can turn to the merits. And Judge Bybee, I think you were correct to point out that, you know, one of the issues with these types of claims is this is an antiquated statute. The California Legislature has passed in recent years a number of statutes specifically addressing collection of online data. You think about the California Consumer Privacy Act. And there isn't any allegation that any of those statutes are violated. Instead, we're looking at the Wiretapping Act. And so you have to think about this transaction and how... So let me interrupt you there. So in the prior case, which you did not participate in but I was asking mostly about Section 1. So I didn't see that you briefed or argued that Section 2 does not apply. That's correct. We did not argue that. But I think the issue becomes, in a lot of ways, you're trying to fit a new technology into an old framework. And it's, in a lot of ways, the square peg into a round hole. And so you really have to focus... Are you now prepared to argue to us that Section 2 does not apply to the Internet? No. But what we are arguing here is when you properly understand the conduct that Section 2 was prohibiting in the context of a telephone communication, and then when you look to the allegations of how session replay code works, you will see that the allegations regarding the collection of data through session replay code doesn't state a violation of Section 2. And we get there, I think, through a number of ways. You start with what Section 2 is aimed at. So you think of a telephone conversation. As the message is moving between one participant to the other, the third party is intercepting that communication. Here, what's alleged, that there are communications between the website operator and the website. So if you're making a purchase, you're telling the website what you're ordering. But what they're challenging, it's a separate stream of data they are alleging is being sent from the website to the session replay code provider. The vast majority of what is collected, as they allege in the complaint, and which we don't dispute, has to do with clicks, scrolls, mouse movements, screen resizes. Because what happens is the session replay code provider uses your navigation and your movements to recreate the way you used the website. That, I don't see them have any argument in their brief that that isn't record information. The way you navigate is not record information. They are focused on text being entered into text fields. But, you know, they said this was just the, you know, the way session replay code operates and the document that we referred to is more of a summary judgment issue because we brought it up. But a couple points to that. The complaint, paragraph 44, recognizes that there is masking of text fields. And what they allege there is that because of the masking of text fields, they don't know what information is being collected. If they can't allege that they know that contents of communication are being collected, they can't state a claim. Going to the the guide, it's called the Definitive Guide to Session Replay Code, that is cited a dozen times in the complaint. If you look at the introduction to the complaint, the first six sites are all direct quotes from that document. It's referred to throughout the complaint. And what that says is that for sensitive information, like passwords, not collected at all. For text fields, by default, it's masked. Because if you think of the way the session replay code operates and the function it serves, it's to show a website operator how users are moving around their websites, the way they're using it. And so the focus is on recreating the movement. It's not collecting the specifics of information. Bloomingdale's is getting that information, processing a transaction if somebody purchases them, sends them the product they want. The session replay code provider isn't doing that. It's tracking the navigation on the website. And that's why, by default, any text fields are masked. We cite a couple district court decisions in our brief, and I know they're not binding in any sort of way, but I think they understood the technology. And what both of those district court decisions say in granting motions to dismiss is if you don't have allegations of how session replay code is configured on the website, then you can't allege that it's collecting private information or the contents of communication. I understand the argument. It makes a lot of sense to me. But what I'm trying to figure out is how would a plaintiff ever be able to bring a claim? Because even the document that you're citing suggests that the ability to collect the text is possible, so that masking is the default, but it's not the only way this system works. How is a plaintiff ever going to know how this thing is configured for a particular website client until they get into litigation? Like, that's not something that you're ever going to just find out as a consumer. So a couple of responses to that. One, I think it could, is possible and could be possible to understand how it works. Another document they cite throughout their complaint was a study that a researcher did in 2017 when he looked at a number of websites that use session replay code, and they identified two websites that they thought collected personal information. So there is an instance of a third party looking at the way session replay code was instituted and recognizing, you know, out of hundreds of websites they looked at, they found one or two that was collecting personal information. Why can't it meet the plausibility standard to allege this is a system that's being used, this system has this capability to see this content that would meet the definition of content for the statute and get past pleading and then resolve whether that's actually happening at summary judgment? I would say it's not sufficiently plausible under Twombly and Nickball where the factual allegations is that in eight years ago, in 2017, somebody was able to identify two websites that collect this information. I mean, I think of, you know, all of the websites that I use, I enter personal information, I check the box that I don't want them to share that with other people. I have no way to know whether they do that or not, but I can't sue them all and say you might have shared it. We'll go through to discovery to see that you did that. You have to have some factual allegation to raise it beyond the level of possibility to the level of plausible. That's, you know, that is the holding of Twombly and Nickball. It's not enough just to say it could be possible that Papa John's or, sorry, this is the last case, but Bloomingdale's hadn't installed session replay code using the default configurations, but there's no allegations that they didn't. And so to raise this to the level of plausible, you would need allegations of that sort that it wasn't, you know, there was something about the way Bloomingdale's was using session replay code that allowed the session replay code provider to see that information. There's no allegations of that sort in the complaint. I think where the consent, I think, is relevant and comes in is, you know, a lot of the information they're focusing on that they're saying is the contents of the communication are the information that is entered when you make the purchase. And, of course, that's the time in which you are consenting. Another thing I think that's important about the consent argument is it's clear under this statute, unlike a lot of other statutes, you know, we often think of consent as more of an affirmative defense. Here it is an element of the cause of action because what you have to allege is that the defendant acted without authorization, without the consent, and so the case law is clear. That's an element you need to plead. So there's no factual allegation here that Ms. Mikulski didn't know about the practice. I think it's telling what the allegation, she has a section where it says she didn't consent, and what she says in there is that a reasonable user of the website wouldn't have known about the collection. I think that's telling because Ms. Mikulski is one of the plaintiffs who has brought a number of these cases against session replay code providers, and so she didn't allege I didn't know about it. She alleges other people may not have known about it, and that we would suggest was not sufficient to allege the lack of consent here, which is a required element under the statute. You're not disputing that Bloomingdale's is collecting, let's take credit card information as something very sensitive and private, that they're collecting private information, and they've given Full Story some access to information, and do we know that they haven't shared the credit card information? So we just don't know whether Full Story read it? No, a couple points on that. We don't dispute that they have alleged that Bloomingdale's receives the credit card information. That could be considered private information, but that is different than whether or not that is record information or the contents of a communication. That's a separate question with respect to Bloomingdale's, but with respect to the information that is going to the session replay code provider, what we're saying is there is no factual allegation that makes it plausible that session replay code providers received the credit card number. The only session replay code provider that's identified in the complaint is Full Story. It's discussed throughout, it's referenced, Full Story's definitive guide to session replay code. In there, it says that they don't collect credit card numbers, so there's no allegation that the session replay code provider receives the credit card number. And then back with Bloomingdale's, district courts- Yeah, but the address, does this also apply to the address and phone number? Correct. So the address, that is one of the features, the address that this court said in Zynga is record information, name, address. Zynga applies to a federal statute, not to the statute before us. But the courts have interpreted them the same way, because the state wiretap statutes were passed around the same time and largely mirror in large- Has California interpreted it that way? They have not that specific provision, but there are cases from California that say that we look to the federal wiretap statute to interpret the statute. And of course, this court did that in Facebook. It interpreted the party exception under the Federal Wiretap Act and SEPA in the same way and noted that courts had interpreted them the same way. So it is true that as a general matter, California courts in interpreting SEPA have looked to the Federal Wiretap Act. But I think a large part of the court's analysis, too, in Zynga was based, as the court said, on the plain meaning of the statutory terms. It was defined in the statute, if I'm recalling right. It's not defined in the statute here. Correct. But the court also looked at dictionary definitions of the term, and so the statutory definition didn't really depart from the plain meaning when the court looked to the contents of a communication. Was it the meaning that was intended to be conveyed by the communication? So it's true that Zynga was interpreting the federal statute. It has the same terms. Certainly, the contents of a communication are the same terms that we see in the Federal Wiretap Act, the State Wiretap Act. They have been interpreted similarly and also given their plain meaning. So what's the implication of what you're telling us? That the session replay code would allow full story to have the name and address of Ms. Mikulski? What we are saying is that, as an initial matter, name and address that is typed into the website by default would be masked when it goes to the session replay code. They don't have an allegation that Bloomingdale's did anything to unmask that. So because of that... What you're telling us is that after Zynga, that that's record information, that there'd be nothing wrong if they were sharing that. Is that right? That's my second point. So my first point is that there's no allegation to plausibly allege that the session replay code read the contents of the communication. Because if the text entry is masked, they can't read it. That's point one. Point two is that even if there was no masking, the name and address would be treated as record information. If we thought that Zynga didn't apply to this case, the Federal Act wasn't persuasive here, and that that name and address was not mere record information, then does the complaint survive if we disagree with that point? No, because of the masking point. But I will point out this is not an argument they've pushed. They have accepted that Zynga controls the interpretation of SEPA. The district court applied Zynga. They said it controls the interpretation of Zynga. In their brief on appeal here, they have relied on Zynga and said they accept the framework set forth in Zynga of what's record information of what is content. So no one before the court has pushed for a definition or an approach in which Zynga doesn't apply here. But as I said here, the focus of the information is not the information going to the website operator. It is the information being conveyed to the session replay code provider. The vast majority of that, of what was alleged in the complaint, are scrolls, clicks, mouse movements. That's what's needed to kind of recreate the navigation of the website. I didn't see anything in their appellate brief, and I didn't hear anything this morning, taking issue with the fact that that is properly treated as record information. What they are focused on is text entered into text fields. Our primary position, based on paragraph 44 of the complaint, is that by default, text fields are masked. And they say in paragraph 44, they don't know if any of that information was collected. And without a plausible allegation that it was collected, they haven't stated a claim. And then, yes, even without masking, our position is that under Zynga, which applies here, fields like the name and address would be treated as record information. Does the court have any questions? Apparently not. Okay, I'll try to be quick here. But on this issue of, like, we don't know what they're collecting, I think that the way to read paragraph 44 is website visitors don't know what's being collected. We also, we make very clear allegations that, because we did an investigation, so we used the developer tools that allow you to see a little more detail about what's going on here. And if you look at ER 34, ER 35, we pulled up some examples. This was from Bloomingdale's If you searched for a specific type of watch, that packet, that bit of information that you just typed gets sent to full story. So right there, paragraph 76 alone, we're showing that contents are being intercepted. Because that is a text entry, and whichever field that was, was not properly masked because it was sent to full story. But the allegations of the complaint start by everything is captured. We admit that there's a possibility for some masking, but our allegations are actually that the masking doesn't work that well. And ER 36, paragraph 82, ER 37, paragraph 83, we say even at the heightened settings of masking, because everything else is still being captured, you're still getting the contents of communications. If you decide you want to buy a watch by clicking on a button, you don't necessarily have to type a text field to say, I want to buy this watch. The way we use websites, clicking and scrolling and moving things around with your mouse is also communicative. You pick what you want. It moves forward into the cart. You say, yeah, now I'm ready to check out. And then you can pick, like, well, pick up a delivery. It might just be a little radio button. And you pick one. You've communicated that way. So the clicks can still be communicative. But I want to emphasize, we are alleging very clearly that there are text fields that are not masked on this website. And things like address. So just to go back to the Zynga case and what it defines as record information, I believe that was mostly talking about IP addresses. But in our case, in Bloomingdale's, when I say address, I'm going to say Mikulski's billing address and her physical address. At least one of those we specifically said she entered because she was making a purchase. So that implied that she had to put one in. That's not something generated by the system. That's something she had to type in to communicate to Bloomingdale's. Bloomingdale's doesn't know where she lives. So when she's buying a product, she has to tell them. That is the contents of the communication. She is telling Bloomingdale's, I live at X, Y, Z, Palm Street, whatever. So the complaint here, when we start with the overall statements that every single thing a person is doing in the environment on the website is tracked. And yes, masking exists, but it doesn't work. And we don't know exactly what the configuration was here. But regardless, there's still contents being captured. We have a stated claim here. And maybe through discovery, they can narrow down exactly which fields were masked or not masked. But no matter what, our allegations that have to be taken as true at this point have said that contents were intercepted here. If there are no further questions, I'm happy to end there. All right. Thank you. I think we have your argument. We thank both sides for their comments. All rise. This Court for this session stands adjourned.
judges: BYBEE, IKUTA, FORREST